IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
March 28, 2018 Session

## STATE OF TENNESSEE v. RONALD LEE FREELS, JR.

**Appeal from the Circuit Court for Sevier County**
**No. 20393-III       Rex H. Ogle, Judge**

_____

## No. E2017-00951-CCA-R3-CD

_____

A Sevier County jury convicted Ronald Lee Freels, Jr., Defendant, of two counts of aggravated sexual battery. The trial court sentenced Defendant to consecutive terms of twenty-five years as a persistent offender with 100% service. On appeal, Defendant claims that the evidence was insufficient to support his convictions and that his sentence was excessive. After review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

ROBERT L. HOLLOWAY, JR., J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS and J. ROSS DYER, JJ., joined.

Samantha A. McCammon, Sevierville, Tennessee, for the appellant, Ronald Lee Freels, Jr.

Herbert H. Slatery III, Attorney General and Reporter; Ronald L. Coleman, Assistant Attorney General; Jimmy B. Dunn, District Attorney General; and Rolfe A. Straussfogel, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

### *Procedural and Factual Background*

The Sevier County Grand Jury by presentment charged Ronald Lee Freels, Jr., "Defendant," with two Class A felony offenses of rape of a child. Count One of the presentment alleged that Defendant "did unlawfully, knowingly and feloniously digitally sexually penetrate . . . N.W. ("the victim"), a minor child, less than thirteen (13) years of age[.]" Count Two of the presentment alleged that Defendant "did unlawfully,

knowingly and feloniously sexually penetrate N.W. a minor child, less than thirteen (13) years of age[.]"

## Jury Trial

At Defendant's jury trial, Investigator Rodney Burns testified that he was assigned to investigate certain allegations made by someone at Pi Beta School to Captain Baskins of the Gatlinburg Police Department. At approximately 4:30 p.m. on January 27, 2015, Investigator Burns contacted Carrie Williams, a school guidance counselor, and the two of them met with Principal Carrie Woods at the school. Based on information received at that meeting, Investigator Burns became aware that the allegations concerned the victim.

On January 28, 2015, Investigator Burns located the victim's mother and had her transported to the police station where he conducted an audio recorded interview. On cross-examination, Investigator Burns agreed that he had difficulty tracking down the victim's mother because she was staying with her boyfriend at a hotel. Although Investigator Burns spoke with the mother's boyfriend at the hotel, he did not formally interview him. Investigator Burns also contacted the victim's father, who was aware of the allegations, and the father scheduled a forensic interview for the victim through the Child Advocacy Center. The forensic interview was conducted on January 28, 2015. Following the forensic interview, Investigator Burns contacted the District Attorney General's office, and an arrest warrant was issued for Defendant. After placing Defendant under arrest, Investigator Burns obtained consent to search Defendant's residence. Investigator Burns also obtained a search warrant by which he was able to secure the possession of six cell phones, which he then had analyzed.[1] Investigator Burns also reviewed a summary of the records from a medical examination of the victim that occurred sometime after the forensic interview. He stated that the records did not indicate any injury to the victim.

On redirect examination, Investigator Burns stated that he also interviewed A.W.,[2] the victim's brother. On recross-examination, trial counsel asked Investigator Burns if the victim's brother had mentioned other individuals "such as a stepsibling, a boyfriend, something of that nature, would that have caused you to have another suspect to interview[.]" He responded, "Not when the suspect was named by the victim."

Defendant recalled Investigator Burns as the defense's first witness. Investigator Burns also agreed that he had not interviewed the victim's stepbrother, nor had he

---

[1] This is the only information about the cell phones in the record.

[2] We will use initials to identify the victim's brother so that the victim's identity remains private. We intend no disrespect.

interviewed anyone in the victim's father's extended family. Investigator Burns stated he observed the forensic interview of the victim's younger brother. Investigator Burns said that he did not find any blue striped pajamas during the search of Defendant's residence, but that he did find a Yahtzee game. Investigator Burns explained that he investigated only Defendant because the victim "knew [Defendant] by name" and "identified him. She knew him."

R.W.,[3] the victim's mother, testified that Defendant was married to her half- sister. She stated that the victim was seven years old during December 2014 and that the victim's brother was approximately ten months younger than the victim. During a time when her half-sister and Defendant were separated, Defendant "asked if he could see the kids because he had been in their lives since they were born[.]" She took the two children to Defendant's house on December 27, 2014, to spend the night. The victim's mother said that, after the overnight visit, the victim "started acting weird" but that she thought it was because she and the victim's father had broken up. She finally questioned the victim on January 20 and then called the victim's father and told him what the victim said.

On cross-examination, the victim's mother stated she was sure the date she took the two children to Defendant's residence was December 27 because it was the day after the victim's brother's birthday. She stated that she did not report what the victim originally told her to the police "[b]ecause the victim had told me that he had touched her on the outside of her clothes. I had seen him play around and everything else, and anybody that has ever played around with kids knows that you could be playing around with them . . . [and] could accidentally touch their bottom on the inside of their leg playing around, not meaning anything by it." The victim's mother also admitted that she did not report what the victim told her "because [she] didn't want [the Department of Children Services] to get back involved in [her] life." She said she was afraid she might lose her children because she was living in a hotel with her boyfriend and that her boyfriend's sister and her family had stayed "with [them] for a couple of nights."

A.W.,[4] the victim's father, testified that he and the victim's mother were separated during December 2014 and January 2015. He stated that he had their two children on Monday, Wednesday, and every other Friday, and that their mother had them the rest of the time. He received a telephone call in January 2015 from a detective about the allegations. He stated that the victim's mother had already spoken to him about what the victim had told her. After talking to the victim, he scheduled a forensic interview of the

---

[3] We will use initials to identify the victim's mother so that the victim's identity remains private. We intend no disrespect.

[4] We will use initials to identify the victim's father so that the victim's identity remains private. We intend no disrespect.

victim. He stated that the victim and the victim's brother had lived with him since January 2015.

Jenny Stith testified that she was a forensic interviewer at Safe Harbor Child Advocacy Center. The trial court qualified Ms. Stith as an expert in "forensic interviewing." She stated that the purpose of a forensic interview was "to allow the child to be able to tell [her] story" after "an allegation of abuse" and that her January 28, 2015 forensic interview with the victim was video and audio recorded. She stated that she used a protocol or format "called RATAC, which is rapport, anatomy identification, touch inquiry, abuse scenario, and then closure" for the interview. She said that she tried to avoid the use of leading questions because the child wants to win the approval of the adult, and a "child will answer the way that they think [the adult] want[s] them to answer, particularly if [the adult] ask[s] a leading question."

The victim testified that she was nine years old at the time of the trial. She stated that she remembered being interviewed, that she had watched the video more than once, and that she told the truth during the video. No further direct or cross-examination of the victim occurred.

The video of the victim's forensic interview was played for the jury. In the forensic interview, the victim stated her mother took her and her brother to spend the night at Defendant's house. The victim stated that Defendant touched her "in a very wrong way." She said she was six when it happened and that it occurred one time. She said she, her brother, and Defendant were playing a board game on the floor in Defendant's bedroom. When asked when the touching occurred, she stated "the day after" she and her brother played the board game. When asked what happened the day after playing the board game, she said Defendant "pulled her over so they could cuddle." After Defendant pulled her over to cuddle, he "touched [her] front and back parts" with his hand, both over and under her clothes. She said his hand and fingers stayed still and did not do anything. When asked if Defendant said anything, she stated no because he was asleep. She stated that "he snored very loudly." When asked how Defendant could be asleep and touch her, she said "he can do that very easily" and that "[her] brother does that to [her]." She said her brother just cuddles. When again asked how Defendant could touch her when he was asleep, she stated "I have no idea" and that "I have not figured that out." She recalled she was wearing blue jeans, a blue shirt, underwear and socks. She said Defendant had on underwear and the top and bottom of his striped blue pajamas. She said she saw him get his pajamas and underwear out of a drawer before he took a shower. She stated her brother was asleep on a pallet in the floor. She said she woke up and felt something tickling the skin of her lower stomach and it was Defendant's hand. She said the incident in the bed occurred in the morning and that she was about to leave and was going to get her brother up.

When asked if she felt Defendant's body, she said "his pajamas." She denied feeling "his body change." When asked about Defendant pulling her over and touching her, she said that she "was asleep and could not feel." She said she went back to sleep. When asked how she knew Defendant touched her on her skin, she stated that she woke up once and felt something tickling her. She stated that Defendant's hand was "right there" on her skin indicating her lower belly below the waist. When asked how his hand touched her skin, she said "I fell asleep on that part." She said she got up and she and her brother played the same board game they played the day before. When asked if she said anything to Defendant, she said "no, he slept through the whole [inaudible], my aunt was over there." When asked how he stopped touching her on the skin, she said "I just pulled away from him." She said Defendant's eyes were closed and that he did not say anything to her. When asked, "did anybody see him?" she said, "no, I just woke my brother up."

Ms. Stith then showed the victim anatomically correct diagrams of a male and a female. The victim named the various body parts on the female diagram. She said that she and all of her brothers call the private areas the "front part" and the "back part" or "bootie." When asked to point out on the female diagram where Defendant touched her "front part" and "back part," she pointed out the areas of the diagram that she identified as the "front part" and "bootie." When asked if she could see that "little bitty mark" on the female diagram,[5] she said yes. When asked if Defendant "went inside that area," she answered yes and stated that his hand went inside her "front part." She denied any other part of Defendant's body penetrated her. She explained that she did not see any of Defendant's body parts, other than his "eyes, eyebrows, nose and mouth, and head with hair." When asked what she saw "down here," she said, "his legs and knees." When asked how she saw his knees if he had on pajamas, she said that he wore shorts. She first said he was lying on his belly when he touched her front part and back part. She said when she felt the tickling she was laying on her back and that he was laying on his side.

The victim said that was the only time that she stayed with Defendant. When asked if Defendant had ever touched her before that one time when he had on the blue striped pajamas, the victim was unable to answer. She was then asked "are you having a hard time saying it," she said "it ha[d] been a long time since [she] s[aw] him." When asked if anybody else had ever touched her body, she shook her head in the negative. She denied Defendant asked her to touch his body or that Defendant said anything about her body, or wanted to take pictures of her body. When asked if Defendant had ever shown her pictures of people without clothes on, she said "yes." She said Defendant showed her pictures on his phone of little girls and boys. She stated that she could see all

---

[5] We assume that the mark on the diagram represents the vagina.

of their bodies and that they did not have any clothes on. She said after Defendant showed her the pictures that "he got in the floor with me and my brother and played."

Ms. Stith left the room for approximately ten minutes. The victim can be seen coloring during her absence. When Ms. Stith returned, she discussed when the touching occurred. Ms. Stith then asked the victim if Defendant touched her once on the floor while they were playing a board game and again in the bed. The victim agreed that it happened both times. She said that, while on the floor playing the game, Defendant leaned over and touched her softly on the skin of her "front part." She said her brother was in the floor playing also. When asked if her brother saw Defendant touch her, she said "no" because her brother had turned his head to pop his neck when Defendant touched her.

Near the conclusion of the interview, Ms. Stith showed the victim two anatomically correct dolls. After explaining their anatomical body parts, Ms. Stith asked the victim to use the dolls to show how Defendant touched her. Ms. Stith handed the victim the two dolls and asked the victim "to fix the clothes like your clothes were fixed." The victim took the dolls without adjusting the clothes and laid them on their backs next to each other. The victim then used the female doll to depict her getting up from the bed, waking up her brother, and starting to play. Ms. Stith then said, "I want you to show me how he touched you." The victim used the hand of the male doll to touch the "front part" of the female doll. Ms. Stith again asked about the vaginal area on the female doll. The victim said Defendant just rubbed it. Ms. Stith then asked the victim if she felt anything inside her, and the victim responded that Defendant put his "front part" in her "bootie." She then laid the female doll on her belly, lowered the clothing and used the male doll to depict anal intercourse. When asked to describe how it felt, she said "it hurt." She said Defendant told her not to tell anybody, but she told her mother, father, and grandmother.

Heather Freels, Defendant's wife, testified that she was living with Defendant from December 26 through December 31, 2014. She stated that she did not recall the victim or the victim's brother staying with Defendant when the victim's mother was not present. On cross-examination, Mrs. Freels stated that she did not think Defendant sexually assaulted the victim.

The jury found Defendant guilty of the lesser-included offense of aggravated sexual battery on each count.

*Sentencing Hearing*

On December 5, 2016, the trial court conducted a sentencing hearing. The trial court admitted the presentence investigation report into evidence. The State entered three

certified copies of Knox County judgments of conviction for aggravated robbery with an offense date of January 7, 1993.[6]

The State called the victim's father as its first witness. He stated that the victim was nine years old at the time of the sentencing hearing and that she was seven years old at the time of the offenses. He stated that the victim had "incidents of bedwetting and acting out for two or three weeks after [] coming to court[.]" He said that the victim was currently in therapy. On cross-examination, the victim's father stated that the victim had not been in therapy before the jury trial because the victim had been on a therapist's waiting list for two years.

Investigator Burns testified that he had investigated Defendant prior to the current offenses and that Defendant pled guilty to and was convicted of assault involving a twelve-year-old female. A copy of the Sevier County judgment of conviction for Class A misdemeanor assault with an offense date of June 24, 2011, was entered as exhibit 3. Investigator Burns stated that, in a previous incident, Defendant was charged with one count of sexual battery and one count of sexual battery by an authority figure of a thirteen-year-old female. The sexual battery charge was dismissed. Defendant pled guilty to assault in the count in which he was charged with sexual battery by an authority figure. A copy of the Sevier County judgment of conviction for assault with an offense date of October 31, 2003, was entered as exhibit 4.

Defendant called James Lee Shultz, a judicial commissioner for Sevier County. Mr. Shultz said that he had known Defendant for fifteen to twenty years and that Defendant worked for him at times. He said Defendant was a trusted employee and that he had given keys to Defendant to "[his] supply garage and he used the tools out of it and had free access to it." He described Defendant's work as "very acceptable."

Concerning his past record, Defendant admitted that he committed the aggravated robberies and that he used an altered shotgun during the commission of those offenses. Defendant also acknowledged that he had been previously convicted of DUI in 2005, misdemeanor theft, driving on a revoked license.

The victim's mother was allowed to make a victim impact statement. She stated that "I know [Defendant] did this because my little girl told me because I asked her exactly what happened. She told me this happened by [Defendant], not somebody else, not her fifteen-year-old brother. [Defendant]."

---

[6] The third judgment of conviction for aggravated robbery shows an offense date of August 20, 1993, not January 7, 1993. Because August 20, 1993, was the date the three judgments for aggravated robbery were entered, this appears to be a clerical error.

At the conclusion of the sentencing hearing, the trial court noted that it had considered the sentencing factors, the purposes for sentencing, and the enhancement factors and mitigation factors. Concerning Defendant's prior convictions necessary to establish the appropriate range, the trial court stated:

> When you've got a shotgun in an aggravated robbery[,] I certainly think that constitutes threatened bodily injury and would suffice to make these separate convictions for range purposes, and therefore make him a Range III offender.

The trial court found that the three aggravated robbery convictions constituted three separate offenses for the purpose of determining Defendant's range pursuant to Tennessee Code Annotated section 40-35-107(b)(4) and determined that Defendant was a Range III persistent offender. The trial court found that Defendant had a previous history of criminal convictions or criminal behavior in addition to those necessary to establish the appropriate range and that Defendant was "an offender whose record of criminal activity is extensive." The trial court also noted that Defendant had a history of committing violent offenses. The trial court found that Defendant committed the offenses to gratify Defendant's desire for pleasure or excitement, but stated that the trial court was "hesitant to put a lot of weight" on that factor because it was basically an assumption based on the nature of the offense.

The trial court sentenced Defendant to twenty-five years on each count with lifetime supervision as a registered sex offender. The trial court found that Defendant had been "convicted of two or more statutory offenses involving sexual abuse of a minor" and ordered the sentences to run consecutively, for a total effective sentence of fifty years in the Department of Correction with release eligibility after service of 100% of the sentence. The trial court denied Defendant's motion for new trial, and Defendant now timely appeals.

### *Analysis*

Defendant claims that the evidence was insufficient for any rational trier of fact to have found Defendant guilty of the offenses beyond a reasonable doubt and that the sentence was excessive and inconsistent with the purposes and principles of the Tennessee Sentencing Reform Act of 1989. The State argues that the evidence was sufficient and that the trial court properly sentenced Defendant. We agree with the State.

*Sufficiency of the Evidence*

Our standard of review for a sufficiency of the evidence challenge is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original); *see also* Tenn. R. App. P. 13(e). Questions of fact, the credibility of witnesses, and weight of the evidence are resolved by the fact finder. *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978), *superseded on other grounds by* Tenn. R. Crim. P. 33 *as stated in State v. Moats*, 906 S.W.2d 431, 434 n.1 (Tenn. 1995). This court will not reweigh the evidence. *Id.* Our standard of review "is the same whether the conviction is based upon direct or circumstantial evidence." *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)) (internal quotation marks omitted).

A guilty verdict removes the presumption of innocence, replacing it with a presumption of guilt. *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997); *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982). The defendant bears the burden of proving why the evidence was insufficient to support the conviction. *Bland*, 958 S.W.2d at 659; *Tuggle*, 639 S.W.2d at 914. On appeal, the "State must be afforded the strongest legitimate view of the evidence and all reasonable inferences that may be drawn therefrom." *State v. Vasques*, 221 S.W.3d 514, 521 (Tenn. 2007).

Tennessee Code Annotated section 39-13-504 states, in pertinent part, that aggravated sexual battery is "unlawful sexual contact with a victim by the defendant" when "[t]he victim is less than thirteen (13) years of age." Tenn. Code Ann. § 39-13-504 (a)(4) (2014). Definitions for terms related to sexual offenses are codified at Tennessee Code Annotated section 39-13-501. "Sexual contact" is defined as including "the intentional touching of the victim's[] . . . intimate parts, or the intentional touching of the clothing covering the immediate area of the victim's[] . . . intimate parts, if that intentional touching can be reasonably construed as being for the purpose of sexual arousal or gratification[.]" Tenn. Code Ann. § 39-13-501(6) (2014). "Intimate parts" is defined as including "the primary genital area, groin, inner thigh, buttock or breast of a human being[.]" Tenn. Code Ann. § 39-13-501(2) (2014). Here, the State alleged that Defendant touched the victim's intimate parts with his hand as the factual basis for count one. The State alleged that Defendant penetrated the victim's anus with his penis as the factual basis for count two.[7]

---

[7] During the closing argument the District Attorney told the jury "I'm going to ask that you return a verdict of guilty on each count. One, for the touching with the hand. The other with the penile penetration she alleged at the end of the video."

Defendant claims that there was insufficient evidence that Defendant "intentionally" had sexual contact with the victim. Our code states that "'[i]ntentional' refers to a person who acts intentionally with respect to the nature of the conduct or to a result of the conduct when it is the person's conscious objective or desire to engage in the conduct or cause the result." Tenn. Code Ann. § 39-11-302(a) (2014). "[I]ntent can rarely be shown by direct proof and must, necessarily, be shown by circumstantial evidence." *Hall v. State*, 490 S.W.2d 495, 496 (Tenn. 1973). "The jury decides the weight to be given to circumstantial evidence, and '[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury.'" *State v. Rice*, 184 S.W.3d 646, 662 (Tenn. 2006) (quoting *Marable v. State*, 313 S.W.2d 451, 457 (Tenn. 1958)). "On appeal, the court may not substitute its inferences for those drawn by the trier of fact in circumstantial evidence cases." *Dorantes*, 331 S.W.3d at 379. The jury could have inferred that Defendant intended to sexually touch the victim because the victim stated that Defendant showed her explicit photographs of minors. Additionally, the jury could have inferred that Defendant intended to sexually touch the victim because the victim stated that he touched her intimate areas multiple times. Based on the verdict, the jury determined beyond a reasonable doubt based on the statements of the victim during the forensic interview that Defendant's sexual contact was intentional, and there is sufficient evidence to support the jury's finding.

Defendant claims that Investigator Burns's investigation was biased because he failed to consider other potential suspects who had contact with the victim, such as the victim's mother's boyfriend, the victim's aunt's boyfriend, the victim's stepbrother, and the victim's father's extended family. However, as the factfinder, the jury determined the credibility of the witnesses. Based on the jury's verdict, the jury impliedly credited Investigator Burns's testimony, and we will not overturn the jury's credibility determination on appeal. *See Cabbage*, 571 S.W.2d at 835. Defendant also claims there was no physical evidence to support the convictions. He notes that the search of Defendant's residence failed to produce the "blue striped pajamas," and there was no proof of any injury to the victim. However, this court has repeatedly held that the testimony of a minor victim alone is sufficient to uphold a conviction. *State v.* Bonds, 189 S.W.3d 249, 256 (Tenn. Crim. App. 2005); *State v. Christopher Lee Blunkall*, No. M2014-00084-CCA-R3-CD, 2015 WL 500751, at *10 (Tenn. Crim. App. Feb. 5, 2015) (holding that a minor victim's testimony was sufficient for conviction despite lack of corroborating evidence), *perm. app. denied* (Tenn. May 15, 2015).

Defendant also points to the testimony of Heather Ruth Freels, Defendant's wife and victim's aunt, who testified that she was with Defendant every night from December 26 through December 31, 2014, and remembers the victim and her brother being at their house during that time but does not remember them staying there alone without their

mother. She was confident of the dates because she and her then boyfriend had been kicked out of their motel, and she had asked Defendant if she could come home to try and reconcile their marriage. However, as we have previously stated, it was within the province of the jury to reject Ms. Freels' testimony and to credit the testimony of the victim's mother that the victim spent the night at Defendant's residence on December 27, 2014.

Defendant further points to the inconsistencies in the statements of the victim during the forensic interview and the implausibility of some of her statements to support his claim of insufficiency of the evidence. Although the victim's statements in the forensic interview were in several instances inconsistent, "the reconciliation of inconsistent testimony is for the jury to resolve." *State v. Jeffery Mark Klocko*, No. M2006-01359-CCA-R3-CD, 2008 WL 2743692, at *9 (Tenn. Crim. App. June 16, 2008) (*citing State v. Pruett*, 788 S.W. 2d 559, 561 (Tenn. 1990)), *perm. app. denied* (Tenn. Dec. 22, 2008). Based on the verdict in this case, the jury resolved certain inconsistencies against the State, like whether Defendant penetrated the victim, and resolved other inconsistencies against Defendant. The victim's credibility and believability and the weight to be given to her statement were questions of fact to be resolved by the jury. *Bland*, 958 S.W.2d at 659; *see also State v. Elkins*, 102 S.W.3d 578, 582–83 (Tenn. 2003) (*quoting State v. Radley*, 29 S.W.3d 532, 537 (Tenn. Crim. App. 1999)) ("a jury's verdict will not be overturned unless there are inaccuracies or inconsistencies that 'are so improbable or unsatisfactory as to create a reasonable doubt of the [defendant's] guilt'"). Here, the jury impliedly credited the victim's statements that Defendant intentionally made sexual contact with her intimate areas. This court will not reweigh the evidence. *Bland*, 958 S.W.2d at 659.

*Sentencing*

Defendant argues that the trial court "erred in sentencing [Defendant] to the middle of the range and also erred in regard to consecutive sentencing[.]" Defendant acknowledges that he is not eligible for probation, but asserts that the trial court improperly enhanced his sentence based on his criminal history.

When the record establishes that the trial court imposed a sentence within the appropriate range that reflects a "proper application of the purposes and principles of our Sentencing Act," this court reviews the trial court's sentencing decision under an abuse of discretion standard with a presumption of reasonableness. *State v. Bise*, 380 S.W.3d 682, 707 (Tenn. 2012). A finding of abuse of discretion "'reflects that the trial court's logic and reasoning was improper when viewed in light of the factual circumstances and relevant legal principles involved in a particular case.'" *State v. Shaffer*, 45 S.W.3d 553, 555 (Tenn. 2001) (quoting *State v. Moore*, 6 S.W.3d 235, 242 (Tenn. 1999)). "[A] trial

court's misapplication of an enhancement or mitigating factor does not remove the presumption of reasonableness from its sentencing determination." *Id.* at 709. Moreover, under those circumstances, this court may not disturb the sentence even if it had preferred a different result. *See State v. Carter*, 254 S.W.3d 335, 346 (Tenn. 2008).

In determining the proper sentence, the trial court must consider:

> (1) [t]he evidence, if any, received at the trial and the sentencing hearing;
>
> (2) [t]he presentence report;
>
> (3) [t]he principles of sentencing and arguments as to sentencing alternatives;
>
> (4) [t]he nature and characteristics of the criminal conduct involved;
>
> (5) [e]vidence and information offered by the parties on the mitigating and enhancement factors set out in [Tennessee Code Annotated sections] 40-35-113 and 40-35-114;
>
> (6) [a]ny statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; and
>
> (7) [a]ny statement the defendant wishes to make in the defendant's own behalf about sentencing.

Tenn. Code Ann. § 40-35-210(b) (2015); *see also State v. Taylor*, 63 S.W.3d 400, 411 (Tenn. Crim. App. 2001). The trial court must also consider the potential or lack of potential for rehabilitation or treatment of the defendant in determining the sentence alternative or length of a term to be imposed. Tenn. Code Ann. § 40-35-103(5) (2015).

To facilitate meaningful appellate review, the trial court must state on the record the factors it considered and the reasons for imposing the sentence chosen. Tenn. Code Ann. § 40-35-210(e) (2015); *Bise*, 380 S.W.3d at 706. However, "[m]ere inadequacy in the articulation of the reasons for imposing a particular sentence . . . should not negate the presumption [of reasonableness]." *Bise*, 380 S.W.3d at 705-06. The party challenging the sentence on appeal bears the burden of establishing that the sentence was improper. Tenn. Code Ann. § 40-35-401(e) (2015), Sentencing Comm'n Cmts.

Aggravated sexual battery is a Class B felony. Tenn. Code Ann. § 39-13-504(b) (2014). The authorized term of imprisonment for a Class B felony is "not less than eight (8) nor more than thirty (30) years." Tenn. Code Ann. § 40-35-111(b)(2) (2015). The authorized term of imprisonment for a Range III persistent offender convicted of a Class B felony is "not less than twenty (20) nor more than thirty (30) years[.]" Tenn. Code Ann. § 40-35-112(c)(2) (2015). Aggravated sexual battery is a "predatory offense." Tenn. Code Ann. § 39-13-523(a)(5)(A) (2014), and any person convicted of a predatory offense, and who has "one (1) or more prior convictions for an offense classified . . . as a predatory offense[,]" is a "[c]hild sexual predator." Tenn. Code Ann. § 39-13-523(a)(3) (2014). A child sexual predator is "required to serve the entire sentence imposed by the court undiminished by any sentence reduction credits the person may be eligible for or earn." Tenn. Code Ann. § 39-13-523(b) (2015).

The trial court used Defendant's three prior convictions for aggravated robbery, which occurred within a twenty-four hour period, to determine that Defendant was a Range III persistent offender. Defendant does not contest the trial court's determination that he was a persistent offender. Regardless, we conclude that the trial court did not err in determining that Defendant was a persistent offender. *See* Tenn. Code Ann. § 40-35-107(a)(1); § 40-35-107(b)(1); § 40-35-107(b)(4) (2015).

The trial court stated that it considered all of the sentencing factors, the purposes for the sentencing, and enhancement and mitigation factors. The trial court found that Defendant had a previous history of criminal convictions or criminal behavior in addition to those necessary to establish the appropriate range and that Defendant was "an offender whose record of criminal activity is extensive." The trial court noted that Defendant had a history of committing violent offenses. The trial court also found that Defendant committed the offenses to gratify Defendant's desire for pleasure or excitement, but placed little weight on that factor. The trial court sentenced Defendant within the twenty to thirty-year range for a persistent offender convicted of a Class B felony. The record establishes that the trial court imposed a sentence within the appropriate range that reflects a "proper application of the purposes and principles of our Sentencing Act[.]" *State v. Bise*, 380 S.W.3d 682, 707 (Tenn. 2012). The trial court did not abuse its discretion in sentencing Defendant to twenty-five years on each count.

The Tennessee Supreme Court has expanded the standard of review in *Bise* to trial courts' decisions regarding consecutive sentencing. *State v. Pollard*, 432 S.W.3d 851, 859 (Tenn. 2013). "So long as a trial court properly articulates reasons for ordering consecutive sentences, thereby providing a basis for meaningful appellate review, the sentences will be presumed reasonable and, absent an abuse of discretion, upheld on appeal." *Id.* at 862 (citing Tenn. R. Crim. P. 32(c)(1); *Bise,* 380 S.W.3d at 705).

The trial court found that Defendant had been "convicted of two (2) or more statutory offenses involving sexual abuse of a minor," which pursuant to Tennessee Code Annotated section 40-35-115(b)(5), provided the trial court the discretion to order the sentences to be run consecutively. The trial court properly articulated its reasons for ordering consecutive sentences and did not abuse its discretion in imposing twenty-five year consecutive sentences.

### Conclusion

After a thorough review of the facts and applicable case law, we conclude that the evidence was sufficient for a rational juror to have found Defendant guilty of two counts of aggravated sexual battery and that the trial court did not abuse its discretion by sentencing Defendant to a total effective sentence of fifty years at 100% service. Therefore, we affirm the judgments of the trial court.

_____
ROBERT L. HOLLOWAY, JR., JUDGE